IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MODERE, INC., a Utah corporation, and MAPLE MOUNTAIN GROUP, INC., a Utah corporation,<br><br>Plaintiffs,<br><br>v.<br><br>AMBER DELOOF, an individual, DEBOSS MARKETING, INC., a Maryland corporation, BRYNN LANG, an individual, BNL, LLC, a Mississippi limited liability company, MARINA SIMONE, an individual, BODY FUEL UNLIMITED, INC., a Florida corporation, and DOES 1-10,<br><br>Defendants. | **MEMORANDUM DECISION & ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br><br>Case No. 2:24-cv-00216-JNP-CMR<br><br>District Judge Jill N. Parrish |

Maple Mountain Group, Inc., doing business as Modere, Inc. ("Modere"), asserts that Amber DeLoof ("Ms. DeLoof"), DeBoss Marketing, Inc., Brynn Lang ("Ms. Lang"), BNL, LLC, Marina Simone ("Ms. Simone"), and Body Fuel Unlimited, Inc. (collectively, "Defendants") are in breach of contract. Before the court is Modere's Motion for a Temporary Restraining Order and Preliminary Injunction. ECF Nos. 9, 17 ("Motion" or "Mot. for TRO") (filed under seal). For the reasons set out below, Modere's Motion is **DENIED**.

### FACTUAL BACKGROUND

Modere is a Utah-based multi-level marketing company. It manufactures and markets a range of nutritional, personal care, and household products. Modere relies, at least in part, on a

network of independent distributors, whom Modere calls "Social Marketers." In addition to buying and reselling the product to customers, these distributors recruit and manage other distributors. "As sponsoring distributors recruit additional distributors, they build a 'downline' of distributors who are, in turn, allowed to recruit new distributors to join their own downlines." Mot. for TRO at 9. A portion of every distributor's sales revenue flows to "upline" distributors.

## I.   Agreements at Issue

***Social Marketer Agreement.*** At enrollment, Modere distributors must sign a contract called the Social Marketer Application and Agreement. ECF No. 17-1 ("Social Marketer Agreement"). This agreement incorporates Modere's Policies and Procedures. ECF No. 17-2 ("Policies"). The Social Marketer Agreement demands that distributors acknowledge that the Policies are binding and that "the Modere Policies and Procedures . . . may be amended at the sole discretion of Modere, and [] agree that any such amendment will apply to [them]." Social Marketer Agreement at 3.[1] When Modere updated its policies—as it occasionally did—it required distributors to consent to the amended Policies through a clickwrap agreement when distributors accessed their online Modere platforms (the so-called "back-office portal"). ECF No. 58 ¶ 32.[2]

Additionally, distributors acknowledge that "continuation of [a] Modere business or [an] acceptance of bonuses or commissions shall constitute my acceptance of any and all amendments."

---

[1] Section 2.3 of the Policies additionally provides that "[a]mendments shall be effective upon notice to all Social Marketers that the Agreement has been modified. Notification of amendments shall be published in official Modere materials." ECF No. 58-6 at 4.

[2] Since 2015, five different versions of the Policies have been in effect—these successive versions were promulgated in 2015, 2017, 2018, 2019, and 2023. A redline comparison of the various iterations of the Policies demonstrates that the relevant contractual terms have varied little. *See* ECF No. 58-6. To the extent any variations are relevant, they are identified and discussed by the court. References and citations to the Policies in the following sections should be presumed to refer to the 2023 Policies.

*Id*. The Social Marketer Agreement states that its term is for one year, but that it can be renewed, including by automatic deduction of an annual renewal fee from distributors' commission bonuses. *Id*. at 5 § 8.A; Policies § 12.2.1.[3]

Both the Social Marketer Agreement and the Policies declare that they are to be governed by the law of Utah. Social Marketer Agreement at 5 § 15; Policies § 9.5. By entering into the Social Marketer Agreement, the parties "consent to jurisdiction and venue before any federal or state court in Utah or Salt Lake counties, state of Utah, for purposes of enforcing an award by an arbitrator or any other matter not subject to arbitration." Social Marketer Agreement at 5 § 16.[4]

The 2019 and 2023 iterations of the Policies state that

[a] corporation, limited liability company, partnership, trust, or other legal business entity (collectively referred to in this section as a "Business Entity") may apply to become a Modere Social Marketer by submitting a properly completed Modere Business Entity Application which can be submitted electronically through the official Modere website. This form is to be used by new Social Marketer applicants as well as existing Social Marketers who wish to change the corporate structure of their Modere business. Existing Social Marketers changing to [a] Business Entity are considered as a change of ownership and treated as a transfer. The change should be submitted with the Sale/Purchase or Transfer of Social Marketer Account form must pay [sic] the applicable change fee, which must be included with the written request and the completed Modere Independent Social Marketer Application and Modere Business Entity Application. Members of the Business

---

[3] The Social Marketer Agreement gives distributors the right to terminate their Modere business at any time. Social Marketer Agreement at 5.

[4] That Agreement specifies that disputes regarding the non-solicitation provision of the Policies are not subject to arbitration:

This arbitration provision shall not apply in cases of a violation of Modere's conflict of interest policies in section 4.9, Modere's downline report request and nondisclosure agreement, and/or Modere's nondisclosure and nonsolicitation agreement. [] The parties consent to jurisdiction and venue before any federal or state court in Utah or Salt Lake counties, state of Utah, for purposes of enforcing an award by an arbitrator or any other matter not subject to arbitration.

Social Marketer Agreement §§ 12-13.

> Entity are jointly and severally liable for any indebtedness or other obligation to Modere.

Policies § 4.4.

Regarding the substantive obligations of distributors, Modere's Policies contain the following provision regarding solicitation:

> For one year following the termination or cancellation of a Social Marketer's Modere Social Marketer Agreement, regardless of the reason for termination or cancellation, he or she shall not recruit any Modere Social Marketer or Customer who is on his or her current or past network report(s) or with whom the Social Marketer became acquainted by virtue of his or her participation as a Modere Social Marketer.

Policies § 4.9.1.2. The Policies define "recruit," in turn, to mean

> actual or attempted solicitation, enrollment, encouragement, or effort to influence in any other way, either directly, through a third party, or indirectly (including but not limited to, the use of a website), another Modere Social Marketer or Customer to enroll or participate in another network marketing opportunity. This conduct constitutes recruiting even if the Social Marketer's actions are in response to an inquiry made by another Social Marketer or Customer.

*Id*. § 4.9.1.4.[5] The Policies contain a carveout, however, for the recruitment of social marketers personally enrolled by the signatory, as well as some immediate family members. *Id*. § 4.9.1.3.

Additionally, a

> Social Marketer stipulates that if he or she violates the terms of paragraphs 1 and/or 2 above, Modere will be irreparably harmed, but calculation of damages will be extremely difficult. The parties therefore stipulate that for each violation of such paragraphs, Modere shall be entitled to immediate injunctive relief and liquidated damages in the amount of $2,500.00 for each occurrence. Each individual or entity

---

[5] Section 13 of the Policies defines "Recruit" as "actual or attempted solicitation, enrollment, encouragement, or effort to influence in any other way, either directly or through a third party, another Modere Social Marketer or Customer to enroll or participate in another multilevel marketing, network marketing, or direct sales opportunity. This conduct constitutes recruiting even if the Social Marketer's actions are in response to an inquiry made by another Social Marketer or Customer."

4

soliicited shall constitute a separate "occurrence," and separate solicitations of the same individual or entity shall also constitute a separate "occurrence."

*Id.* § 4.9.1.6.

The Social Marketer Agreement and incorporated Policies also provides that social marketers agree to maintain confidentiality regarding Modere's confidential information, trade secrets, and proprietary information:

> This confidentiality obligation is irrevocable and permanent, remains after termination of the Agreement, and is subject to legal enforcement by injunction and award of costs and legal fees necessarily incurred. All confidential information is transmitted to, or allowed to be gathered by, Social Marketers in strictest confidence on a need-to-know basis for use solely in the Social Marketer Business Activity. Social Marketers must use their best efforts to keep such information confidential and must not disclose any such information to any third party, directly or indirectly. Social Marketers must not use the confidential information or any information derived therefrom to compete with the Company or for any purpose other than for promoting the Company's program and its products and services.

*Id.* § 4.9.2.

### A. Ms. DeLoof and DeBoss Marketing

According to the evidence proffered by Modere, Ms. DeLoof enrolled as a distributor in late 2016. ECF No. 58 ¶ 38; *cf.* ECF No. 63 ¶ 10. At enrollment, Ms. DeLoof provided her social security number as her tax identification number. She later substituted her social security number for the EIN of DeBoss Marketing on November 21, 2018. *Id.* ¶ 41. In January of 2019, Ms. DeLoof also submitted a business entity application as contemplated by Section 4.4 of the Policies. *See* ECF No. 58-10. The business entity application was emailed to a Modere Elite Services Representative, requesting that her tax documents be "with" her business entity EIN. ECF No. 58-11. Modere's internal information-tracking databases indicate that the distributor account opened by Ms. DeLoof (and for which the business entity application was submitted) executed clickwrap agreements acknowledging all subsequent updates to the Policies. *See* ECF No. 58 ¶¶ 43-44.

Renewal fees for this account were up to date, as the last one-year renewal payment was received by Modere on December 14, 2023. *See* ECF No. 58-13.

### B.  Ms. Lang and BNC, LLC

According to the evidence proffered by Modere, Ms. Lang enrolled as a distributor in May of 2018. ECF No. 58 ¶ 50. At enrollment, Ms. Lang provided her social security number as her tax identification number. Modere alleges that Ms. Lang never submitted a business entity application to transfer the distributor account to BNC, LLC. However, Ms. Lang has provided evidence that she did. First, Ms. Lang has filed a series of photographs, apparently of a business entity application form signed and dated December 19, 2018. *See* ECF No. 62-2. Ms. Lang has also proffered an email, signed "Michelle Smith / Executive Assistant . . . / Modere" reading "Hi Brynn, Attached are copies of your Business Entity Forms. Please let me know if you have any questions," and apparently including the same images of the document. *See* ECF No. 62-3.[6]

Reference to Modere's internal information-tracking database (as provided by Modere) indicates that, on January 15, 2019, an event reading "Company changed from '' to 'BNL LLC'" was entered, along with a corresponding substitution for an EIN in place of a social security number. ECF No. 58-16 at 3. Database records also indicate that the distributor account opened by Ms. Lang (and for with the business entity application was apparently submitted and entered) executed the clickwrap acknowledging all subsequent updates to the Policies. *See* ECF No. 58 ¶¶ 54-55. Renewal fees for this account were up to date, as the last one-year renewal payment was received by Modere on May 15, 2023. *See* ECF No. 58-20. In November of 2023, Ms. Lang executed a Social Marketer Purchase Agreement with Modere, purchasing a downline-upline

---

[6] The email appears to be dated August 6, 2020. ECF No. 62-3.

position. *See* ECF No. 58-17. The preamble to that agreement states that it is formed by and between Modere and "Brynn Lang, an individual under the business name of BNC, LLC." *Id*. Brynn Lang is identified as the contract signatory in that agreement's signature blocks. *Id*.

### C. Ms. Simone and Body Fuel Unlimited

According to the evidence proffered by Modere, Body Fuel Unlimited enrolled as a distributor in April of 2017. ECF No. 58 ¶ 64. At enrollment, the distributor account was opened using the entity name Body Fuel Unlimited and the name of Ms. Simone's partner, Jason Coggio. *Id*. The EIN for Body Fuel Unlimited was provided as the account's tax identification number. *Id*. ¶ 65. Separately, in May of 2017, a physical Social Marketer Agreement bearing Ms. Simone's name was signed. *See* ECF No. 58-23. "Marina Simone" appears to be the signatory to that agreement, and across the top of the second page of that agreement is written "Account should be under Tax ID: [Body Fuel Unlimited tax EIN] / Adding just my name Marina Simone to our account for recognition purposes." *Id*. Modere's internal information-tracking databases indicate that the distributor account opened by Body Fuel Unlimited executed the clickwrap acknowledging all subsequent updates to the Policies. *See* ECF No. 58 ¶¶ 70-71. Renewal fees for this account were up to date, as the last one-year renewal payment was received by Modere on April 10, 2023. *See* ECF No. 58-25.

Ms. DeLoof, Ms. Lang, and Ms. Simone were all provided Form 1099-NEC nonemployee compensation tax forms by Modere. Each Form 1099 identifies the individuals' names as the payment recipients. In each case, however, the individuals assert that their business-entity counterparts' tax information numbers are identified.

***Black Agreements.*** In addition to the Social Marketer Agreement and incorporated Policies, Modere entered into additional agreements with Ms. DeLoof and Ms. Lang, whom it

describes as "very high-level distributors." Mot. for TRO at 13. Ms. DeLoof entered into such an

agreement with Modere on or about May 5, 2020, ECF No. 17-3 ("DeLoof Black Agreement"),

and Ms. Lang entered into such an agreement on or about April 30, 2021. ECF No. 17-4 ("Lang

Black Agreement"). The Black Agreements identify themselves as addenda to the Social Marketer

Agreement, and state that the Black Agreements are "intended to supplement the Social Marketer

Agreement as previously entered into[.]" *See* DeLoof Black Agreement; Lang Black Agreement.

Both Black Agreements contain a provision that reads as follows:

> Furthermore, any act by Social Marketer, entity Social Marketer has interest in, or
> Social Marketer household member that constitutes building a competing network
> marketing or direct selling company, which shall include the following activities:
> joining, recruiting, public promotion, featured in recognition content, attending
> events or meetings, paid or unpaid consulting, or other activities determined by
> Modere in its sole discretion, while enrolled as a Social Marketer and for a period
> of ninety [(90)] days immediately after the date Social Marketer Agreement is
> terminated, will constitute a material breach of this Addendum and will give
> Modere the right to: a) terminate this Addendum upon providing written notice to
> Social Marketer; b) demand repayment of any and all compensation Social
> Marketer was paid as an Platinum Black from the time the Social Marketer
> breached the non-compete; and c) seek any other reasonable relief or damages,
> including but not limited to attorney's fees and costs and any other fines, penalties
> or fees that Modere has the right to exercise as part of the terms and conditions of
> the Social Marketer Agreement.

DeLoof Black Agreement § 4 (emphasis added); *accord* Lang Black Agreement § 4.

Ms. DeLoof is identified as the contracting party to the Black Agreement in that

Agreement's first paragraph. There is no indication in the signature block that Ms. DeLoof signed

in a representative capacity or as the agent of a separate entity.

Ms. Lang's Black Agreement indicates that it is entered into as between Modere and "BNL

LLC Brynn Lang." The Black Agreement's signature block indicates that Brynn Lang signed the

document in her own name. While an "x" is placed next to "entity" next to Modere's signature,

Ms. Lang's signature is accompanied by an "x" next to the word "individual." Further, beneath

8

Ms. Lang's name on the signature block is written "Self/Individual." Under the terms of the Black Agreements, Modere paid Ms. DeLoof and Ms. Lang (or their corporate counterparts) $147,427.08 and $323,256.52, respectively. ECF No. 18 ¶ 31.

## II.   Defendants' Alleged Solicitation and Competition

On February 2, 2024, counsel for Defendants sent to Modere a letter indicating Defendants' intent to terminate their Social Marketer Agreements immediately. ECF No. 10-6. Ms. DeLoof, Ms. Lang, and Ms. Simone (described by Ms. Lang in one social media post as "[three] amigos," ECF No. 11-21), upon resignation from Modere, became distributors for a company called Frequense, a multi-level marketing company that markets and distributes health products. *See* ECF No. 11-2. Modere alleges that, immediately upon their resignation, Ms. DeLoof, Ms. Lang, and Ms. Simone began posting to their social media accounts and communicating with other social media users in such a way that Modere argues constitutes recruiting solicitation and competition.

For example, Modere has filed the declaration of Michelle Churchill ("Ms. Churchill"), a Modere distributor whom Ms. Simone did not personally enroll. Ms. Churchill alleges that Ms. Simone (on February 2, 2024, the same day her termination letter was transmitted) marketed Frequense products to her, encouraged her to enroll as a Frequense distributor, and offered to send her free Frequense products. ECF Nos 12, 12-2. Ms. Lang, in turn, implied on social media that she "convinced" Ms. Simone to join Frequense. ECF No. 11-23.

Similarly, Modere alleges that Ms. DeLoof contacted Amy Smith-Hightower ("Ms. Smith-Hightower") and Kaggan Parker ("Ms. Parker"), whom Ms. DeLoof did not personally enroll, to offer them Frequense products, encourage them to enroll as Frequense distributors, and to market Frequense products. *See* ECF Nos. 15, 15-1, 13, 13-1. Among the evidence of these

communications, Modere has filed the transcription of an audio message apparently sent by Ms. DeLoof to Ms. Parker stating:

> I'm talking to a ton of people outside of my team and outside of [Modere] in general and yes I do have enrollments and I have a ton of people getting on the zoom tonight and I have a ton of people filling out the form and yeah I have a ton of people who are very excited about the products.

ECF No. 13-1 at 6. According to a social media post by Ms. DeLoof, Ms. Smith-Hightower was successfully enrolled as a Frequense distributor. ECF No. 15-2 at 2.

Modere has also submitted scores of social media posts by the Defendants marketing Frequense and its products and inviting their followers to contact them for more information. *See* ECF Nos. 11, 47, 48 (non-electronically filed videos of social media content posted by the Defendants). Modere alleges that the individual Defendants are followed by many Modere distributors whom the individual Defendants did not personally enroll. As a result of the election of Ms. DeLoof, Ms. Lang, and Ms. Simone to terminate their relationships with Modere and join Frequense, and their subsequent social media marketing of Frequense to Modere distributors whom they did not personally enroll, Modere alleges that many high-level Modere distributors have defected from the company, harming their relationship of trust and goodwill with independent distributors. Mot. for TRO ¶¶ 68-69.

## LEGAL STANDARD

To show an entitlement to preliminary injunctive relief under FED. R. CIV. P. 65, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). "Under *Winter*'s rationale, any modified test which relaxes one of the prongs

for preliminary relief and thus deviates from the standard test is impermissible." *Diné Citizens*

*Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016). At bottom, "preliminary

injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant,

by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972

(1997) (citation omitted).

## ANALYSIS

### I.      Jurisdiction

Defendants first argue that preliminary injunctive relief ought not issue because this court

lacks personal jurisdiction over the individual Defendants. Defendants incorporate by reference

the arguments offered in their separately filed motion to dismiss Modere's complaint for lack of

personal jurisdiction and improper venue, ECF No. 44, filed pursuant to FED. R. CIV. P. 12(b)(2)-

(3). The court considers the arguments made in Defendants' motion as it weighs the likely outcome

of the action at the preliminary-injunctive stage.

### A.  Social Marketer Agreement

"A defendant can waive its rights by explicitly or implicitly consenting to litigate future

disputes in a particular State's courts." *Mallory v. Norfolk S. Ry.*, 143 S. Ct. 2028, 2045 (2023);

*Ins. Corp. of Ir. v. Compagnie Des Bauxites De Guinee*, 456 U.S. 694, 704 (1982) ("[P]arties to a

contract may agree in advance to submit to the jurisdiction of a given court[.]") (quoting *National*

*Equipment Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964)).

As described above, Modere's Policies states that "[a]ll [] actions [arising from or relating

to Modere's Conflict of Interest policies contained in Section 4.9] shall be brought before the

Federal or State courts residing in Salt Lake County or Utah County, Utah, U.S.A. Parties consent

to exclusive jurisdiction and venue before such courts." *Id.* § 9.4; *accord* Social Marketer

11

Agreement §§ 12-13.[7] Defendants acknowledge that the corporate Defendants entered into the Social Marketer Agreement. Defendants fail to address the contractual consent to jurisdiction and fail to provide any argument as to why it should be disregarded or considered unenforceable. As a result, the court concludes that it has personal jurisdiction over the corporate Defendants by virtue of their contractual consent.

Although questions of fact regarding parties' intent have likely been raised, each of the individual Defendants—at some point—signed a Social Marketer Agreement or other agreement ostensibly incorporating the Social Marketer Agreement. Although the individual Defendants may or may not have later substituted their corporate counterparts in their place as parties to the contract, Modere has made a prima facie case that they nonetheless consented to personal jurisdiction in this court.[8] In other words, the individual Defendants' initial consent to jurisdiction

---

[7] The Social Marketer Agreement states that the parties consent to personal jurisdiction in this court for matters not subject to arbitration. That Agreement specifies that disputes regarding the non-solicitation provision of the Policies are not subject to arbitration.

> This arbitration provision shall not apply in cases of a violation of Modere's conflict of interest policies in section 4.9, Modere's downline report request and nondisclosure agreement, and/or Modere's nondisclosure and nonsolicitation agreement. [] The parties consent to jurisdiction and venue before any federal or state court in Utah or Salt Lake counties, state of Utah, for purposes of enforcing an award by an arbitrator or any other matter not subject to arbitration.

Social Marketer Agreement §§ 12-13.

[8] The case of Ms. Simone appears to have been slightly different—although the initial enrollment appears to have been through Body Fuel Unlimited, Ms. Simone nonetheless signed a subsequent Social Marketer Agreement. ECF No. 58-23. While handwritten notes on that document may create some question of fact as to whether she intended to be personally bound by the subsequent document, or whether it was merely intended to supplement the underlying agreement between Body Fuel Unlimited and Modere, the court is satisfied that Modere has carried its "light" burden and established personal jurisdiction by a prima facie case. *See Ast Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1056 (10th Cir. 2008) ("[I]n the preliminary stages of litigation, the plaintiff's burden is light . . . When evaluating the prima facie case, the court is bound to

allows this court to determine whether they remain the liable parties to the Social Marketer Agreement and the Black Agreements. As a result, the court is satisfied that Modere has made a satisfactory showing of personal jurisdiction. *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017); *accord Intercon, Inc. v. Bell Atl. Internet Sols., Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000). The court thus finds it appropriate to exercise jurisdiction over Defendants for the purposes of resolving the instant dispute arising from and relating to their contractual relationships with and obligations to Modere.

## II. Likelihood of Success on the Merits

### A. Non-solicitation

The non-solicitation and non-compete provisions at issue here are considered under the general principles of covenants restricting employment under Utah law.[9]

> In an employment context, it is not uncommon for an employer to require an employee to sign a contract stating that the employee will not compete with the employer, disclose private information, or solicit the employer's customers. We have held that such covenants are enforceable as long as they are [(1)] supported by consideration, [(2)] negotiated in good faith, [(3)] necessary to protect a company's good will, and [(4)] reasonably limited in time and geographic area.

---

resolve all factual disputes in favor of the plaintiff in determining whether he has made the requisite showing."); *Intercon, Inc. v. Bell Atl. Internet Sols., Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000).

[9] The court notes that, although Modere asserts violations of the agreements' confidentiality clause, it does not assert that any Defendant actually used any confidential information. Instead, Modere alleges simply that such use and misappropriation is "threatened." Mot. for TRO ¶ 39; Compl. ¶ 51. Additionally, the parties' briefing and argument centers (except for Modere's discussion of irreparable harm) on the non-solicitation and non-compete provisions alone. The court thus concludes that Modere has not met its burden of showing a likelihood of success on its claims as they relate to the confidentiality provisions. In the sections that follow, the court analyzes the breach claims related to non-solicitation and non-competition in light of the parties' briefing and arguments. It expresses no opinion as to the enforceability of the confidentiality provisions.

*TruGreen Cos., L.L.C. v. Mower Bros.*, 2008 UT 81, ¶ 11, 199 P.3d 929 (citing *Allen v. Rose Park Pharmacy*, 120 Utah 608, 237 P.2d 823, 828 (Utah 1951)); *accord Kasco Servs. Corp. v. Benson*, 831 P.2d 86, 88 (Utah 1992).

"In a general sense, the law balances the nature of the interest of one seeking to enforce such a covenant, whether by injunction or by stipulated damages, against the hardship imposed on the employee as the result of the restraint." *Robbins v. Finlay*, 645 P.2d 623, 627 (Utah 1982). "Covenants not to compete which are primarily designed to limit competition or restrain the right to engage in a common calling are not enforceable." *Id*. Additionally, "a covenant not to compete is necessary for the protection of the goodwill of the business when it is shown that although the employee learns no trade secrets, he may likely draw away customers from his former employer, if he were permitted to compete nearby." *Kasco Servs. Corp. v. Benson*, 831 P.2d 86, 88 (Utah 1992).

> ### i)  Consideration

Both the non-solicitation provision in the Social Marketer Agreement and the non-compete provision of the Black Agreements are supported by consideration. Under the Social Marketer Agreement, signatory Defendants were provided access to Modere's business enterprise and compensated with millions of dollars for their efforts. ECF No. 18 ¶ 23. Additionally, signatories to the Black Agreements were provided hundreds of thousands of dollars in additional commissions outside of normal bonuses and commissions in exchange for their promise not to compete for 90 days after the termination of the Social Marketer Agreement. *Id*. ¶ 31.

> ### ii)  Good faith

As to the second element in the four-prong test articulated in *TruGreen*, the court is satisfied that "[t]here is no evidence here of any unfairness in the bargaining process which should result in

the unenforceability of the provision in question." *Robbins v. Finlay*, 645 P.2d 623, 627 (Utah Sup.Ct. 1982). Instead, the agreements at issue represent the bases for years-long, profitable business engagements through which Modere benefited and under which the signatory Defendants were handsomely remunerated and able to build successful distributorship ventures.

<ol type="i" start="3"><li>Necessary to protect goodwill</li></ol>

Restrictive covenants may be necessary where "the goodwill of the employer was associated with, and created by, the employee." *Robbins*, 645 P.2d at 627. "[A]n analysis of goodwill is tied closely to the question of whether a departing firm member has died, retired, or—relevant here—entered into an agreement not to compete. '[A] covenant not to compete is necessary for the protection of the goodwill of [a] business' where a departing employee might 'draw away customers . . . if he were permitted to compete nearby.'" *Peterson v. Jackson*, 2011 UT App 113, ¶ 39, 253 P.3d 1096 (quoting *Kasco Servs. Corp. v. Benson*, 831 P.2d 86, 88 (Utah 1992), and *System Concepts, Inc. v. Dixon*, 669 P.2d 421, 426 (Utah 1983)). "Thus, personal goodwill [can] be transferred to a business via a non-compete agreement. *Id*. ¶ 40 (cleaned up). Here, Modere has proffered satisfactory evidence that Defendants were responsible for Modere's goodwill and that they were likewise privy to trade secrets in Modere's possession. *Id*. [*Robbins*] at 627-28. Additionally, Modere has provided substantial evidence that Defendants' services were "special, unique, or extraordinary," and that their value to Modere was quite high. *Id*. at 628.

<ol type="i" start="4"><li>Reasonably limited in time and geographic area</li></ol>

Finally, the restrictive covenants contained in the contracts-at-suit are likely reasonably limited in time and geographic area and thus enforceable under the *TruGreen* test. The one-year non-solicitation provision of the Social Marketer Agreement and vanishingly brief 90-day non-compete clause of the Black Agreements are reasonably limited in time. *See Bad Ass Coffee Co.*

15

*of Haw., Inc. v. JH Nterprises, LLC*, 636 F. Supp. 2d 1237, 1240 (D. Utah 2009) (issuing preliminary injunction to enforce two-year restrictive covenant); *Kasco Servs. Corp. v. Benson*, 831 P.2d 86, 89 (Utah Sup.Ct. 1992) (upholding eighteen-month restrictive covenant running from date of termination).

And this court is of the view that, given Modere's broad geographic operations, a restrictive covenant unlimited by geographic area is neither overbroad nor otherwise not reasonably necessary to protect the established, legitimate business interests of Modere. *Sys. Concepts v. Dixon*, 669 P.2d 421, 426-427 (Utah 1983) (holding that a restrictive covenant is not void for failing to define a geographic limitation; instead, "[t]he reasonableness of the restraints in a restrictive covenant is determined on a case-by-case basis, taking into account the particular facts and circumstances surrounding the case and the subject covenant. Of primary importance in the determination of reasonableness are the location and nature of the employer's clientele"); *accord Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1231 (11th Cir. 2009). Thus, Modere has demonstrated that the non-solicitation and non-compete clauses of the contracts at issue are likely enforceable.

**B. Breach**

i)      Determining the relevant parties to the contracts

Modere argues that Ms. DeLoof, Ms. Lang, and Ms. Simone are all liable in their individual and corporate capacities for the obligations set out in both the Social Marketer Agreement and, in the case of Ms. DeLoof and Ms. Lang, in the Black Agreements. Defendants argue that it is not the individual Defendants but the corporate entities that they control that are the parties to the relevant contracts—DeBoss Marketing in the case of Ms. DeLoof, BNL, LLC in the case of Ms. Lang, and Body Fuel Unlimited in the case of Ms. Simone.

16

***Social Marketer Agreement****.* As described above, Ms. DeLoof, in January of 2019, submitted a business entity application, under the terms of Section 4.4 of the Policies. Under the 2018 Policies in effect at that time (later clarified and made more explicit through the 2023 Policies[10]), a properly completed business entity application allowed a distributor to change the corporate structure of his or her Modere business. While this language may not be entirely clear, the court determines that it is likely the case that, when Ms. DeLoof submitted her business entity application form (the effect of which Modere does not dispute), DeBoss Marketing became the owner of her distributor account and the relevant contractual party.

As to Ms. Lang, weighing the evidence provided by the parties at this preliminary juncture, the court is satisfied that a fact-finder would likely conclude that Ms. Lang successfully submitted a business entity application and, for the same reasons as Ms. DeLoof (described above), substituted BNC, LLC in place of herself as party to the Social Marketer Agreement. This conclusion is supported by the evidence (both in the form of photographs and the email from a Modere executive assistant) referencing Modere's receipt of the business entity application, as well as the company name and tax identification number change that soon followed in Modere's internal database.

Turning finally to Ms. Simone, Modere represents through a declaration that Ms. Simone enrolled as a distributor—and accepted subsequent clickwrap agreements—through Body Fuel Unlimited. ECF No. 58 ¶¶ 64-67. Although Modere contends that Ms. Simone executed a separate Social Marketer Agreement, across the top of that document was written "Account should be under

---

[10] The 2023 Policies more explicitly state that the effect of the business entity form is to effect a change of ownership and a transfer. ECF No. 58-4 at 6.

Tax ID: [Body Fuel Unlimited tax EIN] / Adding just my name Marina Simone to our account *for recognition purposes*." ECF No. 58-23 (emphasis added). Thus, weighing the evidence at this preliminary stage, the court concludes that Body Fuel Unlimited likely remained the relevant party to the Social Marketer Agreement, and that no transfer of ownership was effected.

*Black Agreements*. As discussed above, Ms. DeLoof is identified as the contracting party to the Black Agreement in that Agreement's first paragraph. There is no indication in the signature block that Ms. DeLoof signed in a representative capacity or as the agent of a separate entity. However, as discussed above, the Black Agreements state that they are "intended to supplement the Social Marketer Agreement *as previously entered into*[.]" *See* DeLoof Black Agreement. Because Ms. DeLoof entered into the Black Agreement after her distributor account was formally transferred, through entry of a business entity application, to DeBoss Marketing, the Black Agreement is likely best understood as supplementing the terms of the Social Marketer Agreement between DeBoss Marketing and Modere.

The case of Ms. Lang's Black Agreement is similar but admittedly less straightforward. As described above, the Black Agreement's signature block indicates that Brynn Lang signed the document in her own name. While an "x" is placed next to "entity" next to Modere's signature, Ms. Lang's signature is accompanied by an "x" next to the word "individual." Further, beneath Ms. Lang's name on the signature block is written "Self/Individual." This is consistent with an argument that Ms. Lang, in her individual capacity, was intended to be the proper counterparty to the underlying Social Marketer Agreement given her apparent failure to file a business entity application. However, reference to Modere's internal information-tracking database reveals that, even after the execution of the Black Agreement, the relevant account listed the account owner under the company name "BNL LLC." ECF No. 58-16. Additionally, because the Black Agreement

18

indicates that it was "intended to supplement the Social Marketer Agreement *as previously entered into*," the court finds that it is more likely that it is best understood as supplementing the terms of the Social Marketer Agreement as between BNC, LLC and Modere. *See* DeLoof Black Agreement.

*     *     *

In sum, the court concludes, for the purposes of this preliminary analysis, that the relevant contractual parties as of the alleged 2024 breach are (1) DeBoss Marketing as to both the Social Marketer Agreement and Black Agreement, (2) BNC, LLC as to both the Social Marketer Agreement and Black Agreement, and (3) Body Fuel Unlimited as to the Social Marketer Agreement.

    ii)   Whether the agreements were violated by the actions alleged

Turning to the merits, the court is satisfied that the social media conduct complained of by Modere—particularly the direct social media messages—qualifies as solicitation and competition under the plain terms of the agreements.[11] Considering the evidence of Defendants' allegedly

---

[11] As described above, the non-solicitation provision of the Social Marketer Agreement provides:

> For one year following the termination or cancellation of a Social Marketer's Modere Social Marketer Agreement, regardless of the reason for termination or cancellation, he or she shall not recruit any Modere Social Marketer or Customer who is on his or her current or past network report(s) or with whom the Social Marketer became acquainted by virtue of his or her participation as a Modere Social Marketer.

Policies § 4.9.1.2. The Policies define "recruit," in turn, to mean

> actual or attempted solicitation, enrollment, encouragement, or effort to influence in any other way, either directly, through a third party, or indirectly (including but not limited to, the use of a website), another Modere Social Marketer or Customer to enroll or participate in another network marketing opportunity. This conduct constitutes recruiting even if the Social Marketer's actions are in response to an inquiry made by another Social Marketer or Customer.

19

violative conduct, the court is satisfied that it is likely that Ms. Simone's contacts with Ms. Churchill, Ms. Lang's contacts with Ms. Simone, and Ms. DeLoof's contacts with Ms. Smith-Hightower and Ms. Parker, each of whom was not personally enrolled by the Defendants, would constitute recruiting under Section 4.9.1.2 of the Policies and would thus be violative of the Social Marketer Agreement's non-solicitation agreement. Additionally, the court is satisfied that it is likely that the actions and social media activity by Ms. DeLoof and Ms. Lang, as described above, in connection with their Frequense business, would constitute the building of a competing network marketing or direct selling company and would thus be violative of the Black Agreements'

---

Id. § 4.9.1.4. Section 13 of the Policies contains defines "Recruit" as "actual or attempted solicitation, enrollment, encouragement, or effort to influence in any other way, either directly or through a third party, another Modere Social Marketer or Customer to enroll or participate in another multilevel marketing, network marketing, or direct sales opportunity. This conduct constitutes recruiting even if the Social Marketer's actions are in response to an inquiry made by another Social Marketer or Customer." The non-compete provision of the Black Agreements, in turn, states that

> any act by Social Marketer, entity Social Marketer has interest in, or Social Marketer household member that constitutes building a competing network marketing or direct selling company, which shall include the following activities: joining, recruiting, public promotion, featured in recognition content, attending events or meetings, paid or unpaid consulting, or other activities determined by Modere in its sole discretion, while enrolled as a Social Marketer and for a period of ninety [(90)] days immediately after the date Social Marketer Agreement is terminated, will constitute a material breach of this Addendum and will give Modere the right to: a) terminate this Addendum upon providing written notice to Social Marketer; b) demand repayment of any and all compensation Social Marketer was paid as an Platinum Black from the time the Social Marketer breached the non-compete; and c) seek any other reasonable relief or damages, including but not limited to attorney's fees and costs and any other fines, penalties or fees that Modere has the right to exercise as part of the terms and conditions of the Social Marketer Agreement.

DeLoof Elite Agreement § 4 (emphasis added); accord Lang Elite Agreement § 4.

prohibition on non-competition during the 90-day period subsequent to the termination of the Social Marketer Agreement.

iii)   Whether the individual Defendants' actions are attributable to the corporate Defendants

The court next considers whether the social media activity at issue can be properly attributed to the corporate Defendants (that is, the signatories to the agreements) such that Modere has demonstrated a likelihood of success on the merits by showing that the agreements were likely violated *by contract parties*. Rather than present a theory under which the individuals' social media activity can be attributed to the corporate entities, Modere argues either that the individual Defendants are, in fact, contract parties (which, for the reasons laid out above, this court rejects) *or* that the individual Defendants are liable under the contract by operation of Section 4.4 of the Policies. At all relevant times, Section 4.4 of the Policies stated that "[m]embers of [a] Business Entity are jointly and severally liable for any indebtedness or other obligation to Modere." Thus, Modere argues that, as members of the corporate entities, the individual Defendants are bound by the non-solicitation and non-compete provisions of the agreements.

In order for Modere's proposed interpretation to hold true, the court must accept that the non-solicitation and non-compete provisions create an "obligation" under the language of Section 4.4, and that individual Defendants, as members of the corporate entities, are bound by the same because the agreement refers to joint and several liability. While Modere may have potentially identified an interpretive ambiguity that could, in theory, give rise to a question of fact for a later

stage of litigation,[12] its proposed interpretation of the contractual language is certainly not the best possible reading and thus not the likely result on the merits.

Simply stated, Modere's position that its agreement with the Defendant business entities rendered the individual Defendants liable for the obligations of the entities is contrary to basic tenets of corporate identity and contract law. To adopt Modere's reading would, in effect, take the agreements, although between Modere and the business entities, to be effectively between Modere *and every member* of those business entities. In short, it would vitiate the business entity's liability shield altogether. To adopt this reading would do violence to the basic principles of respecting the corporate form and read the contract language in a way that the distributors would not have been likely to foresee at signing. If Modere truly wanted every member of a business entity to be bound by the contractual promises of the business entity, thus upsetting longstanding, well-settled black-letter principles of corporate law, it should have required a personal guarantee or require that all members of the entities sign in their individual capacities. *E.g.*, *Reedeker v. Salisbury*, 952 P.2d 577, 582 (Utah Ct. App. 1998) ("[A] contract between a member and a corporation is not a contract between a member and those individuals who direct or manage the corporation."); *accord H&P Invs. v. iLux Capital Mgmt. LLC*, 2021 UT App 113, ¶ 50, 500 P.3d 906; *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1177 (2d Cir. 1993) ("A director is not personally liable for his corporation's contractual breaches unless he assumed personal liability, acted in bad faith or committed a tort in connection with the performance of the contract.").

This result may seem formalistic, but it is demanded by the parties' contractual arrangements and the design choices fashioned by Modere itself. Modere elected to allow

---

[12] The court need not decide as much as this juncture.

individual distributors to substitute corporate entities as contractual counterparties, and now asks this court to disregard that decision (and the corporate form altogether). The language of Section 4.4 does not clearly signal in intent to disrupt the traditional observance of corporate liability shielding.[13] Thus, Modere has not shown an entitlement to relief that is clear under the circumstances.

Because Modere has failed to demonstrate a theory under which the actions of Ms. DeLoof, Ms. Lang, and Ms. Simone violated the contractual promises of DeBoss Marketing, BNC, LLC, and Body Fuel Unlimited (respectively), it has not shown a likelihood of success on the merits, falling short of its obligation to, by a clear showing, carry the burden of persuasion. *Mazurek*, 520 U.S. at 972. As a result, it has failed to establish the first of four necessary elements of the conjunctive test for Rule 65 preliminary injunctive relief. *Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits[.]"); *accord Diné Citizens*, 839 F.3d at 1281-82.

## CONCLUSION & ORDER

For the foregoing reasons, Modere's Motion for Temporary Restraining Order and Preliminary Injunction, ECF Nos. 9, 17 (filed under seal), is **DENIED**.

---

[13] Additionally, observing this boundary is especially important here, in the context of equitable relief under a claim for breach of contract, where adopting Modere's reading would have the effect *not only* of disregarding the separable promises of a business entity from its members *but also* potentially enforcing contractual promises against non-parties to the agreements.

DATED May 17, 2024.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge